# EXHIBIT A

# LIST OF PLEADINGS CONTAINED IN EXHIBIT A

Verified Complaint ........................................................................................................ 1

Verification .................................................................................................................... 2

Exhibit 1 to Verified Complaint ...................................................................................... 3

Supplemental Information Sheet...................................................................................... 4

Motion for Temporary Restraining Order.......................................................................... 5

Proposed Order for Temporary Restraining Order ............................................................ 6

Motion for Expedited Proceedings .................................................................................. 7

Proposed Order for Expedited Proceedings...................................................................... 8

# EXHIBIT 1

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| SENSUS USA, INC., SENSUS WORLDWIDE LIMITED, and SENSUS WORLDWIDE HOLDINGS LIMITED, | ) | |
| Plaintiffs, | ) | |
| v. | ) | C.A. No. |
| BENJAMIN P. FRANKLIN, JR., | ) | |
| Defendant. | ) | |

**VERIFIED COMPLAINT**

Plaintiffs Sensus USA, Inc., Sensus Worldwide Limited, and Sensus Worldwide Holdings Limited (collectively "Sensus") bring this action against Defendant Benjamin P. Franklin, Jr. ("Franklin" or "Defendant"), a former employee of Sensus. Sensus seeks damages and injunctive relief based on Franklin's breach of his employment promise not to unfairly compete with Sensus. Sensus alleges as follows:

**THE PARTIES**

1. Sensus USA, Inc. is a Delaware corporation formerly known as Sensus Metering Systems, Inc. Sensus is headquartered in Raleigh, North Carolina and has operations throughout the United States and Canada.

2. Sensus Worldwide Limited is a company organized under the laws of Bermuda and formally known as Sensus Metering Systems (Bermuda 2) Ltd.

3. Sensus Worldwide Holdings Limited is a company organized under the laws of Bermuda and formally known as Sensus Metering Systems (Bermuda 1) Ltd.

4. Sensus USA, Inc. is a direct, wholly owned subsidiary of Sensus Worldwide Limited and an indirect, wholly owned subsidiary of Sensus Worldwide Holdings Limited. Sensus Worldwide Limited is a direct, wholly owned subsidiary of Sensus Worldwide Holdings Limited.

5. Upon information and belief, Franklin is a resident of Georgia, with his primary residence located at 5114 North Sanderlin Mt Drive, Jasper, Georgia 30143.

6. Defendant is a former employee of Sensus.

7. The Court has personal jurisdiction of Franklin because Sensus is seeking injunctive relief and damages arising from Franklin's breach of his Employment and Non-Interference Agreement ("Agreement") with Sensus. In the Agreement, the Franklin promised that that the state and federal courts of Delaware have exclusive jurisdiction over their claims. Agreement Section 21 states in part:

> THE PARTIES TO THIS AGREEMENT HEREBY (1) AGREE UNDER ALL CIRCUMSTANCES ABSOLUTELY AND IRREVOCABLY TO INSTITUTE ANY LITIGATION, PROCEEDING OR OTHER LEGAL ACTION IN A COURT OF COMPETENT JURISDICTION LOCATED IN DELAWARE, WHETHER A STATE OR FEDERAL COURT; (2) AGREE THAT IN THE EVENT OF ANY SUCH LITIGATION, PROCEEDING OR ACTION, SUCH PARTIES WILL CONSENT AND SUBMIT TO THE PERSONAL JURISDICTION OF ANY SUCH COURT DESCRIBED IN CLAUSE (1) OF THIS SECTION AND TO SERVICE OF PROCESS UPON THEM IN ACCORDANCE WITH THE RULES AND STATUTES GOVERNING SERVICE OF

> PROCESS … (3) AGREE TO WAIVE TO THE FULL EXTENT PERMITTED BY LAW ANY OBJECTION THAT THEY MAY NO OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH LITIGATION, PROCEEDING OR ACTION IN ANY SUCH COURT …

8. The Court has subject matter jurisdiction pursuant to 10 *Del. C.* § 341 because Sensus is seeking equitable relief and has no adequate remedy at law.

## FACTUAL BACKGROUND

9. Sensus is a manufacturer of metering systems and automatic metering infrastructure for water, gas, and electric utilities.

10. Franklin was an executive at Sensus starting in June 2006, when Sensus acquired substantially all the assets of Advanced Metering Data Systems, LLC, a company founded by Franklin. Franklin personally benefitted significantly from this acquisition. He was employed by Sensus in the position of Director of Business Development and Director of Sales.

11. Franklin entered into an Employment and Non-Interference Agreement ("Agreement") with Sensus on June 13, 2006, a copy of which is attached as Exhibit 1 and incorporated by reference. The Agreement contains a valid and enforceable Non-Competition, Non-Solicitation, Non-Disclosure, and Non-Disparagement provisions ("Post-Employment Restrictions"). (Agreement § 7).

12. The Post-Employment Restrictions prohibit Franklin for a period of two years from his date of termination with Sensus from taking employment with a

Sensus competitor, or encouraging, soliciting, or attempting to induce any Sensus employee to terminate his/her employment with Sensus.

13. In addition, Franklin is barred from disclosing or using any of Sensus' confidential business information.

14. On August 17, 2015, Franklin submitted notice of his resignation from Sensus, effective two weeks later.

15. On or about August 19, 2015, Sensus learned that Franklin accepted a position with Silver Springs Network.

16. Silver Springs Network is a direct competitor of Sensus.

17. Upon information and belief, Franklin will begin working for Sensus' direct competitor immediately after his last day of employment at Sensus. Franklin's duties at Silver Springs Network will be substantially similar to the work he performed for Sensus.

**FIRST CLAIM**
**<u>BREACH OF CONTRACT</u>**
**(Violation of the Agreement - Damages)**

18. Sensus realleges the allegations of the foregoing paragraphs of the Complaint.

19. Sensus and Franklin executed a valid and enforceable Agreement.

20. Franklin breached the material provisions of the Agreement by accepting a position with Sensus's direct competitor.

21. As a direct and proximate result of Franklin's acts, Sensus has been damaged in excess of $75,000.00.

**SECOND CLAIM**
**BREACH OF CONTRACT**
**(Violation of the Agreement – Injunctive Relief)**

22. Sensus realleges the allegations of the foregoing paragraphs of the Complaint.

23. Franklin's employment by Silver Springs Network is a direct violation of the Agreement.

24. Franklin and Sensus agreed at Agreement § 7(e) that specific performance, including injunctive relief is an appropriate remedy for violation of the Agreement. Agreement § 7(e) states:

> All the parties hereto agree that their rights under this Section 7 are special and unique and that violation thereof would not be adequately compensated by money damages and each grants the other the right to specifically enforce (including injunctive relief where appropriate) the terms of this Agreement.

25. Injunctive relief is appropriate to remedy Franklin's clear violation of the Agreement and he should be immediately enjoined from working for Silver Springs Network for the pendency of the Post-Employment Restrictions.

**PRAYER FOR RELIEF**

WHEREFORE, Sensus prays that the Court:

1. Grant Sensus judgment against Franklin for actual damages in an amount to be shown at the trial of this action;
2. Grant Sensus injunctive relief against Franklin by barring his conduct in violation of the Agreement;
3. Award Sensus pre-judgment and post-judgment interest on all damages proven at the trial of this action;
4. Assess the costs of this action, including reasonable attorney's fees, against the Franklin; and
5. Grant Sensus such other and further relief as the Court may deem just and proper.

PROCTOR HEYMAN ENERIO LLP

*/s/ Samuel T. Hirzel, II*
Samuel T. Hirzel (#4415)
Aaron M. Nelson (#5941)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
*Attorneys for Plaintiff*

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
Kevin S. Joyner
N.C. Bar No. 25605
Phillip J. Strach
N.C. Bar No. 29456
J. Allen Thomas
N.C. Bar No. 40119
4208 Six Forks Road, Suite 1100
Raleigh, N.C. 27609
Telephone: (919) 787-9700
Facsimile: (919) 783-9412
Kevin.Joyner@ogletreedeakins.com
Phil.Strach@ogletreedeakins.com
Allen.Thomas@ogletreedeakins.com

# Exhibit 1

# EXHIBIT 2

**VERIFICATION**

STATE OF NORTH CAROLINA )
) SS.
COUNTY OF WAKE )

David Alban, being duly sworn, deposes and says that he is the authorized representative of Sensus USA Inc., formerly known as "Sensus Metering Systems, Inc.", Sensus Worldwide Holdings Limited f/k/a "Sensus (Bermuda 1) Limited", and Sensus Worldwide Limited f/k/a "Sensus (Bermuda 2) Limited", that he has reviewed the Verified Complaint, and that the facts contained in the Verified Complaint are true and correct to the best of his knowledge, information and belief.

David Alban
Senior IP Counsel

SWORN TO and SUBSCRIBED before me this 24th day of August, 2015.

Mandel C. Edwards, II
Notary Public



# EXHIBIT 3

EMPLOYMENT AND NON-INTERFERENCE AGREEMENT

This Employment and Non-Interference Agreement, dated as of June 13, 2006 (the "Agreement"), is by and between Benjamin P. Franklin, Jr. (the "Executive") and Sensus Metering Systems Inc., a Delaware corporation (the "Company"), which is a wholly-owned subsidiary of Sensus Metering Systems (Bermuda 2) Ltd., a company organized under the laws of Bermuda ("Bermuda 2"), which is a wholly-owned subsidiary of Sensus Metering Systems (Bermuda 1) Ltd., a company organized under the laws of Bermuda ("Holdings").

WITNESSETH:

WHEREAS, the Company is a party to that certain Asset Purchase Agreement (the "AMDS APA"), dated June 2, 2006, between the Company and Advanced Metering Data Systems, L.L.C. ("AMDS"), a company founded by the Executive;

WHEREAS, the Company wishes to obtain the future services of the Executive for the Company and its divisions and direct and indirect subsidiaries;

WHEREAS, the Executive is willing, upon the terms and conditions herein set forth, to provide services hereunder; and

WHEREAS, the Company wishes to secure the Executive's non-interference, upon the terms and conditions herein set forth;

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, and intending to be legally bound hereby, the parties hereto agree as follows:

1. Nature of Employment; Term of Employment.

Subject to Section 25, the "Term of Employment" shall commence as of the Closing Date (as defined in the AMDS APA), and extend to the date that is three (3) years after the Closing Date (the "Third Anniversary"), unless sooner terminated as hereinafter provided; provided, that such term shall continue for the twelve-month period following the Third Anniversary, and for each twelve-month period thereafter, unless at least 90 days prior to the scheduled expiration date, either the Executive or the Company notifies the other of its decision not to continue such term. Should the Executive's employment be earlier terminated by the Company pursuant to Section 4(a), by the Executive pursuant to Section 4(b) or mutually by both parties pursuant to Section 4(c), the Term of Employment shall end on the date of such earlier termination. Nothing contained herein shall be deemed to be an obligation on the part of the Company to extend the Term of Employment. During the Term of Employment, the Company agrees to retain the Executive in its employ, and the Executive agrees to remain in the employ of the Company, as Director of Business Development. The Executive will carry out his duties as Director of Business Development with respect to all the divisions and direct and indirect subsidiaries of Holdings (which companies, together with the Company, shall be referred to collectively as the "Company Group"), subject to the direction of the Holdings' Chief Executive Officer (the "Chief Executive Officer").

2.    Extent of Employment.

(a)    During the Term of Employment, the Executive shall perform his obligations hereunder faithfully and to the best of his ability under the direction of the Chief Executive Officer of the Company to whom the Executive shall directly report, and shall abide by the rules, customs and usages from time to time established by the Company or Holdings.

(b)    During the Term of Employment, the Executive shall devote all of his business time, energy and skill to the performance of his duties, responsibilities and obligations hereunder (except for vacation periods and reasonable periods of illness or other incapacity), consistent with past practices and norms in similar positions. The Executive will have such authority and power as are inherent to the undertakings applicable to his position as Director of Business Development and which are necessary to carry out his responsibilities and the duties required of him hereunder.

(c)    Nothing contained herein shall require the Executive to follow any directive or to perform any act which would violate any laws, ordinances, regulations or rules of any governmental, regulatory or administrative body, agent or authority, any court or judicial authority, or any public, private or industry regulatory authority (collectively, "Regulations"). The Executive will not (i) breach or violate any provision of any Regulations in any material respect or (ii) otherwise act in any manner which might reasonably be expected to have a material adverse effect on the ongoing business, operations, conditions, prospects or other business relationships or properties of any company in the Company Group or Holdings.

3.    Compensation.

(a)    Base Salary.  During the Term of Employment, the Company shall pay compensation to the Executive as base compensation for his services hereunder, in substantially equal bi-weekly installments, an annual base salary of $150,009.60 (the "Base Salary").  The Board of Directors of Holdings (the "Board of Directors") shall annually, and in its sole discretion, determine whether the Base Salary should be increased and, if so, the amount of such increase.

(b)    Annual Bonus.  During the Term of Employment, in addition to the Base Salary, commencing the fiscal year beginning on April 1, 2006, the Company shall pay to the Executive an annual bonus or performance incentive compensation, up to 10% of the Executive's Base Salary, subject to such performance and other conditions as the Board of Directors shall determine on an annual basis, and a pro rata reduction in respect of any period that the Executive is not employed by the Company (the "Annual Bonus") pursuant to the Company's Management Incentive Program.

4.    Termination.

(a)    Company Termination.  Subject to the Company's obligations to make the payments contemplated by Section 4(d), the Term of Employment may be terminated at any time by the Company:

(i)    upon the death of the Executive;

(ii) in the event that because of physical or mental disability the Executive is unable to perform, and does not perform, as certified by a mutually agreeable competent medical physician, his material duties hereunder for 180 days in any continuous 210 day period;

(iii) for Cause or Material Breach; or

(iv) for any other reason not referred to in clauses (i) through (iii) including nonrenewal of the Term by the Company under Section 1 or no reason, and the Company shall not be required to specify a reason for the termination, provided that termination of the Executive's employment by the Company shall be deemed to have occurred under this clause (iv) only if it is not for reasons described in clauses (i) through (iii) such that this Agreement, subject to the provisions of Section 4(d), shall be construed as terminable at will by the Company.

The Executive acknowledges that no representations or promises have been made concerning the grounds for termination or the future operation of the Company's business, and that, except as set forth in the following sentence, nothing contained herein or otherwise stated by or on behalf of the Company modifies or amends the right of the Company to terminate the Executive at any time, with or without Cause or Material Breach. Termination shall become effective 30 days after written notice, or, if for Cause or Material Breach, upon the delivery by the Company to the Executive of written notice specifying the basis of such termination and, if for Cause or Material Breach, the specific reasons therefor.

(b) Executive Termination. Subject to the Company's obligations to make the payments contemplated by Section 4(d), the Term of Employment may be terminated at any time by the Executive:

(i) upon the death of the Executive;

(ii) in the event that because of physical or mental disability the Executive is unable to perform, and does not perform, as certified by a mutually agreeable competent medical physician, his material duties hereunder for 180 days in any continuous 210 day period;

(iii) under circumstances involving a material reduction in the Executive's position, authority, base compensation or benefits or a hostile or adverse work environment, taken as a whole; or

(iv) voluntarily or for any reason or no reason not referred to in clauses (i) through (iii) or no reason or non renewal of this Agreement by either the Executive or the Company (a "Voluntary Termination"), after 30 days' prior written notice to the Company and its Board of Directors, provided that the expiration of the Term of Employment pursuant to Section 1, or any renewal term thereof, will not be considered a Voluntary Termination.

(c) Mutual Termination. Subject to the Company's obligations to make the payments contemplated by Section 4(d), the Term of Employment may be terminated at any time by the

mutual agreement of the Company and the Executive. Any termination of the Executive's employment by mutual agreement of the parties will be memorialized by an agreement which is reduced to writing and signed by the Executive and a duly appointed officer of the Company.

(d)   Severance. If the Executive's employment is terminated for any reason whatsoever, then the Executive shall be entitled to (x) accrued and unpaid base salary and benefits (including sick pay, vacation pay and benefits under Section 6) with respect to the period prior to termination, (y) reimbursement for expenses under Section 5 with respect to such period, and (z) any other benefits (including COBRA) required by law to be provided after termination of employment under the circumstances. Except as may otherwise be expressly provided to the contrary in this Agreement, nothing in this Agreement shall be construed as requiring the Executive to be treated as employed by the Company for purposes of any employee benefit plan following the date of the termination of the Executive's Term of Employment. In the event the Executive's employment is terminated pursuant to:

(i)   Sections 4(a)(i) [Death], or 4(a)(ii) [Disability] by the Company, 4(b)(i) [Death], 4(b)(ii) [Disability], 4(b)(iii) [Material Reduction] by the Executive, or 4(c) [Mutual Termination] by the Executive, the Company will also pay to the Executive (or his estate or representative) the Executive's Base Salary for a 12 month period following the actual date the Term of Employment is terminated; and

(ii)   Section 4(a)(iii) [Cause or Material Breach] by the Company or 4(b)(iv) [Any or No Reason] by the Executive, there will be no additional amounts owing by the Company to the Executive under this Agreement from and after such termination; and

(iii)   Section 4(a)(iv) [Any or No Reason] by the Company, the Company will pay to the Executive the Executive's base salary through the Third Anniversary, the balance of the term of the original Agreement, or for a 12 month period, whichever is longer.

(e)   Continuing Provisions. Termination of the Term of Employment will not terminate Sections 7, 8, 9, 10, 12 through 24, and related definitions, or any other provisions not associated specifically with the Term of Employment.

(f)   Mitigation. In the event of termination, the Executive shall not have a duty to mitigate the Company's payment obligations under Section 4(d) by seeking alternative employment; provided, however, that if the Executive does accept alternative employment, payment obligations under Section 4(d) shall be subject to offset by any amounts of base and bonus compensation earned by the Executive through such alternate employment.

(g)   Company Election. Subject to the terms and conditions of this Agreement, during the period beginning on the date of delivery of a written notice by the Company or the Executive, as the case may be, indicating that the Term of Employment is to be terminated, and ending on the actual date the Term of Employment is terminated, which, in any event, shall be no later than 180 days following the delivery of such notice, the Executive shall continue to perform his duties as set forth in this Agreement, and shall also perform such services for the Company as are necessary and appropriate for a smooth transition to the Executive's successor, if any.

Notwithstanding the foregoing provisions of this Section 4(g), the Company may suspend the Executive from performing his duties under this Agreement following the delivery of a written notice by the Executive providing for the Executive's resignation, or delivery by the Company of a notice providing for the Executive's termination of employment for any reason; provided, however, that during the period of suspension (which shall end upon the actual date the Term of Employment is terminated, which in any event shall be no later than 180 days following the delivery of such notice), the Executive shall continue to be treated as employed by the Company for other purposes, and his rights to compensation or benefits shall not be reduced by reason of the suspension.

5.    Reimbursement of Expenses.

During the Term of Employment, subject to the approval of the Chief Executive Officer of the Company, the Company shall reimburse the Executive for reasonable and documented travel, entertainment, moving and other expenses reasonably incurred by the Executive in connection with the performance of his duties hereunder and, in each case, in accordance with the rules, customs and usages promulgated by Holdings and the Company from time to time in effect.

6.    Benefits.

(a)    Vacation.  The Executive shall be entitled to four (4) weeks paid vacation.

(b)    Insurance and Other Plans.  The Executive shall be entitled to participate in and be covered by any insurance plan (including but not limited to medical, dental, health, life, accident, hospitalization and disability), profit sharing or other employee benefit plan of the Company, to the same extent and on the same terms as such benefits are or may be provided by the Company, at the sole discretion of the Board of Directors, from time to time to other members of senior management.

7.    Non-Competition/Non-Disclosure Provisions.

(a)    Non-Competition.  In consideration of this Agreement, the Executive covenants and agrees that during the Term of Employment and, for a period of two (2) years from the date of termination of the Term of Employment (the "Restricted Period"), the Executive shall not, subject to this Section 7, without the express written approval of the Board of Directors of the Company, directly or indirectly, in one or a series of transactions, own, manage, operate, control, invest or acquire an interest in, whether as a proprietor, partner, stockholder, member, lender, director, officer, employee, joint venturer, investor, lessor, supplier, customer, agent, representative or other participant, or otherwise engage or participate in, whether as a proprietor, partner, stockholder, member, lender, director, officer, employee, joint venturer, investor, lessor, supplier, customer, agent, representative or other participant, any business which competes, directly or indirectly, with the Business in the Market ("Competitive Business") without regard to (A) whether the Competitive Business has its office, manufacturing or other business facilities within or without the Market, (B) whether any of the activities of the Executive occur or are performed within or without the Market or (C) whether the Executive resides, or reports to an office, within or without the Market; provided, however, that (x) the Executive may, anywhere in

the Market, directly or indirectly, in one or a series of transactions, own, invest or acquire an interest in up to two percent (2%) of the capital stock of a corporation whose capital stock is traded publicly, or that (y) the Executive may accept employment with a successor company to the Company.

(b)    Non-Solicitation.  If the Executive's employment is terminated, then, subject to this Section 7, the Executive shall not during the Restricted Period, without the Company's prior written consent, (A) directly or indirectly, in one or a series of transactions, knowingly recruit, solicit or otherwise induce or influence any proprietor, partner, stockholder, member, lender, director, officer, employee, sales agent, joint venturer, investor, lessor, customer, supplier, agent, representative or any other person which has a business relationship with the Company Group or had a business relationship with the Company Group within the twenty-four (24) month period preceding the date of the incident in question, to discontinue, reduce or modify such employment, agency or business relationship with the Company Group, or (B) knowingly employ or seek to employ or cause any Competitive Business to employ or seek to employ any person or agent who is then (or was at any time within twelve (12) months prior to the date the Executive or the Competitive Business employs or seeks to employ such person) employed or retained by the Company Group.  Notwithstanding the foregoing, nothing herein shall prevent the Executive from providing a letter of recommendation to an employee with respect to a future employment opportunity.

(c)    Non-Disclosure.  The Executive further agrees, during and after the Term of Employment, the Restricted Period and thereafter, that the Executive will not, directly or indirectly in one or a series of transactions disclose to any person or use or otherwise exploit for his own benefit or for the benefit of anyone other than the Company Group any Confidential Information (as defined below) whether prepared by the Executive or not provided, however, that any Confidential Information may be disclosed to officers, representatives, employees and agents of the Company Group who need to know such Confidential Information in order to perform the services or conduct the operations required or expected of them in the Business.  The Executive shall use his best efforts to prevent the removal of any Confidential Information from the premises of the Company Group, except as required in his normal course of employment by the Company Group.  During the Term, the Executive shall use his commercially reasonable efforts to cause all persons or entities to whom Confidential Information shall be disclosed by the Executive hereunder to observe the terms and conditions set forth herein as though each such person or entity was bound hereby.  After the Term, the Executive shall not disclose Confidential Information other than to his advisors, representatives and agents who agree to observe the confidentiality terms and conditions set forth herein.  The Executive shall have no obligation hereunder to keep confidential any Confidential Information if and to the extent disclosure of any thereof is specifically required by law; provided, however, that in the event disclosure is required by applicable law, the Executive shall provide the Company with prompt notice of such requirement to the extent allowed by law, prior to making any disclosure, so that the Company may seek an appropriate protective order.  At the request of the Company, the Executive agrees to deliver to the Company all Confidential Information which the Executive may possess or control.  The Executive agrees that all Confidential Information of the Company Group (whether now or hereafter existing) conceived, discovered or made by him during his employment with the Company Group exclusively belongs to the Company Group (and not to the Executive).  The Executive will promptly disclose such Confidential Information to the Company Group and

perform all actions reasonably requested by the Company Group to establish and confirm such exclusive ownership. As used herein, the term "Confidential Information" means any confidential information including, without limitation, any study, data, calculations, software storage media or other compilation of information, patent, patent application, copyright, trademark, trade name, service mark, service name, "know-how", trade secrets, customer lists, details of client or consultant contracts, pricing policies, operational methods, marketing plans or strategies, product development techniques or plans, business acquisition plans or any portion or phase of any scientific or technical information, ideas, discoveries, designs, computer programs (including source of object codes), processes, procedures, formulas, improvements or other proprietary or intellectual property of the Company Group, whether or not in written or tangible form, and whether or not registered, and including all files, records, manuals, books, catalogues, memoranda, notes, summaries, plans, reports, records, documents and other evidence thereof. The term Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that becomes generally available to the public other than as a result of a disclosure by the Executive not permissible hereunder.

(d) Non-Disparagement. The Executive agrees, during and after the Term of Employment, the Restricted Period and thereafter, that he shall not make any false, defamatory or disparaging statements about Holdings or the Company Group or the officers or directors of Holdings or the Company Group. During and after the Executive's employment with the Company Group, the Company agrees on behalf of itself and its subsidiaries that neither the officers nor the directors of the Company Group shall make any false, defamatory or disparaging statements about the Executive.

(e) Specific Performance. All the parties hereto agree that their rights under this Section 7 are special and unique and that violation thereof would not be adequately compensated by money damages and each grants the other the right to specifically enforce (including injunctive relief where appropriate) the terms of this Agreement.

8. Defense of Claims.

The Executive agrees that, for the period beginning on the date hereof, and continuing for a reasonable period after termination or expiration of the Term of Employment, the Executive will cooperate with the Company in defense of any claims that may be made against the Company Group, and will cooperate with the Company in the prosecution of any claims that may be made by Company Group, to the extent that such claims may relate to services performed by the Executive for the Company Group. The Executive agrees to promptly inform the Company if he becomes aware of any lawsuits involving such claims that may be filed against Holdings or the Company Group. The Company agrees to reimburse the Executive for all of the Executive's reasonable and documented out-of-pocket expenses associated with such cooperation, including travel expenses. For periods during and following the Executive's employment with the Company, the Company agrees to provide reasonable compensation to the Executive for such cooperation in addition to reimbursement of expenses and his reasonable attorneys' fees, if any.

9. Definitions.

"Agreement" has the meaning set for the in the preamble.

"AMDS" her the meaning set forth in the recitals.

"AMDS APA" her the meaning set forth in the recitals.

"AMDS Shareholders Agreement" means that certain Subscription and Shareholders Agreement, dated as of the Closing Date made by and between Holdings and AMDS.

"Annual Bonus" has the meaning set forth in Section 3(b).

"Authority" means any governmental, regulatory or administrative body, agency or authority, any court or judicial authority, any public, private or industry regulatory authority, whether national, Federal, state or local or otherwise, or any Person lawfully empowered by any of the foregoing to enforce or seek compliance with any applicable law, statute, regulation, order or decree.

"Base Salary" has the meaning set forth in Section 3(a).

"Bermuda 2" has the meaning set forth in the preamble.

"Board of Directors" has the meaning set forth in Section 3(a).

"Business" means the Company's business and operations, as presently conducted or proposed to be conducted, including the provision of technology, equipment, applications, software or monitoring services in respect of (i) automatic meter reading, as well as interfaces to electricity, water and gas meters; (ii) radio frequency monitoring or control of equipment or devices; (iii) tower-based telemetry; (iv) sub-metering; and (v) equipment monitoring software-based value-added services relating to any of the foregoing.

"Cause" means any of the following:

(i)      the Executive's conviction of, or plea of guilty or *nolo contendere* to, a felony or a crime involving embezzlement, conversion of property or moral turpitude;

(ii)      the Executive's fraud, embezzlement or conversion of property;

(iii)      the Executive's conviction of, or plea of guilty or *nolo contendere* to, a crime involving the acquisition, use or expenditure of federal, state or local government funds;

(iv)      an administrative or judicial determination that the Executive committed fraud or any other violation of law involving federal, state or local government funds;

(v)      the Executive's material violation, with the actual knowledge of the Executive, of any obligations imposed upon the Executive, whether as a shareholder or otherwise, under this Agreement, the Memorandum of Association or Bye-Laws of Holdings, the organizational and formation documents of any of Holdings' direct or indirect subsidiaries, the AMDS Shareholders Agreement or any other agreement between the Executive and the Company or its affiliates; or

(vi)    the Executive's material and knowing failure, to observe or comply with Regulations whether as an officer, shareholder or otherwise, in any material respect or in any manner which would reasonably be expected to have a material adverse effect in respect of the Company Group's ongoing business, operations, condition (financial and other), prospects and other business relationships.

"Chief Executive Officer" has the meaning set forth in Section 1.

"Company" has the meaning set forth in the preamble.

"Company Group" has the meaning set forth in Section 1.

"Competitive Business" has the meaning set forth in Section 7(a).

"Confidential Information" has the meaning set forth in Section 7(c).

"Executive" means Benjamin P. Franklin, Jr. or his estate, if deceased.

"Holdings" has the meaning set forth in the preamble.

"knowing" and "knowledge" shall each refer to actual knowledge without any duty of investigation.

"Market" means any county, province or similar local jurisdiction in the United States of America, Canada, or any other country in which the Business was conducted by or engaged in by the Company Group or AMDS prior to the date hereof or is conducted or engaged in by the Company Group at any time during the Term of Employment.

"Material Breach" means:

(i)    the Executive's breach of any of his fiduciary duties to any company in the Company Group or the Company's stockholders or making of a willful misrepresentation or omission which breach, misrepresentation or omission would reasonably be expected to materially adversely affect the business, properties, assets, condition (financial or other) or prospects of any company in the Company Group;

(ii)    the Executive's willful, continual and material neglect or failure to discharge his material duties, responsibilities or obligations prescribed by this Agreement or any other agreement between the Executive and any company in the Company Group (other than arising solely due to physical or mental disability);

(iii)    the Executive's habitual drunkenness or substance abuse, which materially interferes with the Executive's ability to discharge his duties, responsibilities and obligations prescribed by this Agreement;

(iv)    the Executive's violation of any non-competition, non-solicitation, non-disparagement or confidentiality agreement with any company in the Company Group,

including without limitation, those set forth in Section 7 of this Agreement, or any other agreements with any company in the Company Group; and

(v) the Executive's gross neglect of such his duties and responsibilities, as determined by Holdings' Board of Directors;

provided, for purposes of clauses (i) – (v), to the extent such conduct is able to be remedied or cured by the Executive, and such conduct is not cured or remedied after the Company or the Board of Directors has provided the Executive with 30 days' written notice of such circumstances and the possibility of a Material Breach in reasonable detail, and the Executive fails to cure such circumstances and Material Breach within those 30 days. No act or omission shall be deemed gross neglect if done, or omitted to be done, in good faith by the Executive based upon a resolution duly adopted by the Board of Directors. Whether a breach can be cured or remedied shall be determined by the Board of Directors in its sole discretion.

"Regulations" has the meaning set forth in Section 2(c).

"Restricted Period" has the meaning set forth in Section 7(a).

"Term of Employment" has the meaning set forth in Section 1.

"Third Anniversary" has the meaning set forth in Section 1.

"Voluntary Termination" has the meaning set forth in Section 4(b)(iv).

10. Notice.

Any notice, request, demand or other communication required or permitted to be given under this Agreement shall be given in writing and if delivered personally, sent by certified or registered mail, return receipt requested, sent by overnight courier or sent by facsimile transmission (with confirmation and a copy sent by mail within one day) as follows (or to such other addressee or address as shall be set forth in a notice given in the same manner):

| | |
|---|---|
| If to the Executive: | Benjamin P. Franklin, Jr.<br>3491 Buckhead Loop<br>Unit 401<br>Atlanta GA 30326 |
| If to the Company or the Chief Executive Officer: | Sensus Metering Systems Inc.<br>8601 Six Forks Road<br>Suite 300<br>Raleigh, NC 27615<br>Attention: Chief Executive Officer |

Any such notices shall be deemed to be given on the date personally delivered or sent by facsimile transmission or such return receipt is issued or the day after if sent by overnight courier.

11. Executive's Representations.

The Executive represents, warrants and covenants to Holdings and the Company Group that:

(a) Noncompetes. The Executive is not a party to any written employment contract or written agreement not to compete with or solicit from any of his former employers, other than his employment agreement with AMDS dated September 21, 2005, which will terminate as of the Closing (as defined in the AMDS APA).

(b) Proceedings. To the best of his knowledge and belief, during his tenure with his former employers, the Executive did not engage directly in any activity which would give rise to any disciplinary or other similar proceeding before any federal or state governmental agency or self-regulatory organization, and he has not been subject to or involved in any such proceeding and no such proceeding is threatened.

(c) Sophistication. He is knowledgeable and sophisticated as to business matters, including the subject matter of this Agreement, and that prior to assenting to the terms of this Agreement, or giving the representations and warranties herein, he has been given a reasonable time to review it and has consulted with counsel of his choice.

(d) Regulations. He will not knowingly breach or violate any provision of any Regulations in any material respect or in any manner which might reasonably have a material adverse effect in respect of the ongoing business, operations, conditions, or other business relationships or properties of any of the companies in the Company Group.

12. [Not Used.]

13. Company's Obligation; Taxes.

The Executive agrees and acknowledges that the obligations owed to the Executive under this Agreement are solely the obligations of the Company, and that none of the Company's, Holdings' or their direct and indirect subsidiaries nor their respective stockholders, directors, officers or lenders will have any obligations or liabilities in respect of this Agreement and the subject matter hereof. Any amounts payable to the Executive pursuant to this Agreement shall be subject to withholding and any other applicable taxes.

14. Validity.

If, for any reason, any provision hereof shall be determined to be invalid or unenforceable, the validity and effect of the other provisions hereof shall not be affected thereby.

15. Severability.

If any one or more of the provisions of this Agreement should be ruled wholly or partially invalid or unenforceable by a court of competent jurisdiction, then (i) the validity and enforceability of all provisions of this Agreement not ruled to be invalid or unenforceable shall be unaffected, and (ii) the provision(s) held wholly or partially invalid or unenforceable shall be

deemed amended, and such court is authorized to reform the provision(s), to the minimum extent necessary to render them valid and enforceable in conformity with the parties' intent as manifested herein.

16.    Right to Withhold Payments.

Upon the determination of a majority of the Board of Directors that the Executive has breached his obligations in any material respect under Sections 7 or 8, the Company pursuing all available remedies under this Agreement, at law or otherwise, and without limiting its right to pursue the same, shall have the right to cease all payments to the Executive under this Agreement.

17.    Waiver of Breach; Specific Performance.

The waiver by the Company or the Executive of a breach of any provision of this Agreement by the other party shall not operate or be construed as a waiver of any other breach of such other party. Each of the parties (and third party beneficiaries) to this Agreement will be entitled to enforce its rights under this breach of any provision of this Agreement and to exercise all other rights existing in its favor. The parties hereto agree and acknowledge that the Company would be irreparably injured by a violation of Sections 7 or 8 of this Agreement, that the provisions of such sections are reasonable and that the Company could not adequately be compensated in monetary damages, in light of the sensitivity of the non-public information of the Company to which the Executive will be exposed and that any party (and third party beneficiaries) may in its sole discretion apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive relief, including temporary restraining orders, preliminary injunctions and permanent injunctions in order to enforce or prevent any violations of the provisions of such sections of this Agreement.

18.    Assignment; Third Parties.

Neither the Executive nor the Company may assign, transfer, pledge, hypothecate, encumber or otherwise dispose of this Agreement or any of his or its respective rights or obligations hereunder, without the prior written consent of the other. The parties agree and acknowledge that each of Holdings, its direct and indirect subsidiaries and the shareholders of, lenders to and investors therein are intended to be third party beneficiaries of, and have rights and interests in respect of, the Executive's agreements set forth in Sections 7 and 8.

19.    Amendment; Entire Agreement.

This Agreement may not be changed orally but only by an agreement in writing agreed to by the party against whom enforcement of any waiver, change, modification, extension or discharge is sought. This Agreement constitutes the entire agreement between the parties concerning the subject matter hereof and supersedes all prior and contemporaneous agreements, if any, between the parties relating to the subject matter hereof. The enforceability of this Agreement shall not cease or otherwise be adversely affected by the termination of the Executive's employment with the Company. The Executive and the Company agree that the language used in this Agreement is the language chosen by the parties to express their mutual intent, and that no rule of strict construction is to be applied against any party hereto.

20.    Arbitration.

(a)    Except with respect to disputes or controversies arising out of Sections 7 or 8 hereto, any dispute between any of the parties hereto or claim by a party against another party arising out of or in relation to this Agreement or in relation to any alleged breach thereof shall be finally determined by arbitration in accordance with the rules then in force by the American Arbitration Association. The arbitration proceedings shall take place in Wilmington, Delaware, or such other location as the parties in dispute hereafter may agree upon; and such proceedings shall be governed by the laws of the State of Delaware as such laws are applied to agreements between residents of such State entered into and to be performed entirely within that State.

(b)    The parties shall agree upon one arbitrator, who shall be an individual skilled in the legal and business aspects of the subject matter of this Agreement and of the dispute. If the parties cannot agree upon one arbitrator, each party in dispute shall select one arbitrator and the arbitrators so selected shall select a third arbitrator. In the event the arbitrators cannot agree upon the selection of the third arbitrator, the third arbitrator shall be appointed by the American Arbitration Association at the request of any of the parties in dispute. The arbitrators shall, if possible, be individuals skilled in the legal and business aspects of the subject matter of this Agreement and of the dispute.

(c)    The decision rendered by the arbitrator or arbitrators shall be accompanied by a written opinion in support thereof. The decision shall be final and binding upon the parties in dispute without right of appeal. Judgment upon the decision may be entered into any court having jurisdiction thereof, or application may be made to that court for a judicial acceptance of the decision and any other enforcement.

(d)    THIS AGREEMENT SHALL BE GOVERNED BY, CONSTRUED, APPLIED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE. EACH OF THE PARTIES HERETO ACKNOWLEDGES AND AGREES THAT IN THE EVENT OF ANY BREACH OF THIS AGREEMENT, THE NON-BREACHING PARTY WOULD BE IRREPARABLY HARMED AND COULD NOT BE MADE WHOLE BY MONETARY DAMAGES, AND THAT, IN ADDITION TO ANY OTHER REMEDY TO WHICH THEY MAY BE ENTITLED AT LAW OR IN EQUITY, THE PARTIES SHALL BE ENTITLED TO SUCH EQUITABLE OR INJUNCTIVE RELIEF AS MAY BE APPROPRIATE. THE CHOICE OF FORUM SET FORTH IN THIS SECTION 20 SHALL NOT BE DEEMED TO PRECLUDE THE ENFORCEMENT OF ANY JUDGMENT OF A DELAWARE FEDERAL OR STATE COURT OR THE TAKING OF ANY ACTION UNDER THIS AGREEMENT TO ENFORCE SUCH A JUDGMENT IN ANY OTHER APPROPRIATE JURISDICTION.

21.    IN THE EVENT ANY PARTY TO THIS AGREEMENT COMMENCES ANY LITIGATION, PROCEEDING OR OTHER LEGAL ACTION IN CONNECTION WITH OR RELATING TO THE PROVISIONS OF SECTION 7, THIS AGREEMENT, ANY RELATED AGREEMENT OR ANY MATTERS DESCRIBED OR CONTEMPLATED HEREIN OR THEREIN, THE PARTIES TO THIS AGREEMENT HEREBY (1) AGREE UNDER ALL CIRCUMSTANCES ABSOLUTELY AND IRREVOCABLY TO INSTITUTE ANY LITIGATION, PROCEEDING OR OTHER LEGAL ACTION IN A COURT OF

COMPETENT JURISDICTION LOCATED WITHIN DELAWARE, WHETHER A STATE OR FEDERAL COURT; (2) AGREE THAT IN THE EVENT OF ANY SUCH LITIGATION, PROCEEDING OR ACTION, SUCH PARTIES WILL CONSENT AND SUBMIT TO THE PERSONAL JURISDICTION OF ANY SUCH COURT DESCRIBED IN CLAUSE (1) OF THIS SECTION AND TO SERVICE OF PROCESS UPON THEM IN ACCORDANCE WITH THE RULES AND STATUTES GOVERNING SERVICE OF PROCESS (IT BEING UNDERSTOOD THAT NOTHING IN THIS SECTION SHALL BE DEEMED TO PREVENT ANY PARTY FROM SEEKING TO REMOVE ANY ACTION TO A FEDERAL COURT IN DELAWARE; (3) AGREE TO WAIVE TO THE FULL EXTENT PERMITTED BY LAW ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH LITIGATION, PROCEEDING OR ACTION IN ANY SUCH COURT OR THAT ANY SUCH LITIGATION, PROCEEDING OR ACTION WAS BROUGHT IN ANY INCONVENIENT FORUM; (4) AGREE, AFTER CONSULTATION WITH COUNSEL, TO WAIVE ANY RIGHTS TO A JURY TRIAL TO RESOLVE ANY DISPUTES OR CLAIMS RELATING TO THIS AGREEMENT; (5) AGREE TO DESIGNATE, APPOINT AND DIRECT AN AUTHORIZED AGENT TO RECEIVE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS AND DOCUMENTS IN ANY LEGAL PROCEEDING IN DELAWARE; (6) AGREE TO PROVIDE THE OTHER PARTIES TO THIS AGREEMENT WITH THE NAME, ADDRESS AND FACSIMILE NUMBER OF SUCH AGENT; (7) AGREE AS AN ALTERNATIVE METHOD OF SERVICE TO SERVICE OF PROCESS IN ANY LEGAL PROCEEDING BY MAILING OF COPIES THEREOF TO SUCH PARTY AT ITS ADDRESS SET FORTH HEREIN FOR COMMUNICATIONS TO SUCH PARTY; (8) AGREE THAT ANY SERVICE MADE AS PROVIDED HEREIN SHALL BE EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (9) AGREE THAT NOTHING HEREIN SHALL AFFECT THE RIGHTS OF ANY PARTY TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW. TO THE EXTENT PERMITTED BY LAW IN CONNECTION WITH OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENT OR ANY MATTERS DESCRIBED OR CONTEMPLATED HEREIN OR THEREIN, AND AGREE TO TAKE ANY AND ALL ACTION NECESSARY OR APPROPRIATE TO EFFECT SUCH WAIVER.

22.     Further Action.

The Executive and the Company agree to perform any further acts and to execute and deliver any documents which may be reasonable to carry out the provisions hereof.

23.     Headings.

The headings contained in this Agreement are for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

24.     Counterparts.

This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

25. Effectiveness. Notwithstanding any of the provisions of this Agreement, this Agreement shall only become effective upon the Closing (as defined in the AMDS APA). In the event that the Closing does not occur, this Agreement shall be null and void and of no further force or effect.

[End of page]

IN WITNESS WHEREOF, the parties hereto have set their hands as of the day and year first written above.

EXECUTIVE:

Benjamin P. Franklin, Jr.
Benjamin P. Franklin, Jr.

SENSUS METERING SYSTEMS INC.

By: ______________________________
Name:
Title:

IN WITNESS WHEREOF, the parties hereto have set their hands as of the day and year first written above.

EXECUTIVE:

______________________________
Benjamin P. Franklin, Jr.

SENSUS METERING SYSTEMS INC.

By: ______________________________
Name: Dan Harness
Title: Chief Executive Officer

# EXHIBIT 4

SUPPLEMENTAL INFORMATION PURSUANT TO RULE 3(A)
OF THE RULES OF THE COURT OF CHANCERY

The information contained herein is for the use by the Court for statistical and administrative purposes only. Nothing stated herein shall be deemed an admission by or binding upon any party.

1. Caption of case: *Sensus USA, Inc., Sensus Worldwide Limited, and Sensus Worldwide Holdings Limited, Plaintiffs v. Benjamin P. Franklin, Jr., Defendant*

2. Date filed: August 24, 2015

3. Name and address of counsel for plaintiff(s):
Samuel T. Hirzel (#4415)
Aaron M. Nelson (#5941)
Proctor Heyman Enerio LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801

4. Short statement and nature of claim asserted: Action for breach of contract and injunctive relief

5. Substantive field of law involved (check one):

____Administrative law ____Labor law ____Trusts, Wills and Estates
_X_Commercial law ____Real Property ____Consent trust petitions
____Constitutional law ____348 Deed Restriction ____Partition
Corporation law ____Zoning ____Rapid Arbitration (Rules 96,97)
____Trade secrets/trade mark/or other intellectual property ____Other

6. Related cases, including any Register of Wills matters (this requires copies of all documents in this matter to be filed with the Register of Wills): None

7. Basis of court's jurisdiction (including the citation of any statute(s) conferring jurisdiction): 10 *Del. C.* § 341

8. If the complaint seeks preliminary equitable relief, state the specific preliminary relief sought. Temporary Restraining Order and Preliminary Injunction

9. If the complaint seeks a TRO, summary proceedings, a preliminary injunction, or Expedited Proceedings, check here _X_. (If #9 is checked, a Motion to Expedite must accompany the transaction.)

10. If the complaint is one that in the opinion of counsel should not be assigned to a Master in the first instance, check here and attach a statement of good cause. _____

_/s/ *Samuel T. Hirzel* (#4415)________________
Signature of Attorney of Record & Bar ID

# EXHIBIT 5

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| SENSUS USA, INC., SENSUS WORLDWIDE LIMITED, and SENSUS WORLDWIDE HOLDINGS LIMITED, | ) | |
| Plaintiffs, | ) | |
| v. | ) | C.A. No. |
| BENJAMIN P. FRANKLIN, JR., | ) | |
| Defendant. | ) | |

**MOTION FOR TEMPORARY RESTRAINING ORDER**

Plaintiffs Sensus USA, Inc., Sensus Worldwide Limited, and Sensus Worldwide Holdings Limited (collectively "Sensus"), by and through its undersigned counsel, hereby move for a temporary restraining order (the "TRO Motion") against Defendant Benjamin P. Franklin, Jr. ("Franklin" or "Defendant"), a former employee of Sensus.

**THE PARTIES**

1. Sensus is a manufacturer of metering systems and automatic metering infrastructure for water, gas, and electric utilities.

2. Franklin was an executive at Sensus starting in June 2006, when Sensus acquired substantially all the assets of Advanced Metering Data Systems, LLC, a company founded by Franklin. Franklin personally benefitted significantly from this

acquisition.  He was employed by Sensus in the position of Director of Business Development and Director of Sales.

3.    Franklin entered into an Employment and Non-Interference Agreement ("Agreement") with Sensus on June 13, 2006, a copy of which is attached as Exhibit 1 and incorporated by reference.  The Agreement contains a valid and enforceable Non-Competition,  Non-Solicitation,  Non-Disclosure,  and  Non-Disparagement provisions ("Post-Employment Restrictions").  (Agreement § 7).

4.    The Post-Employment Restrictions prohibit Franklin for a period of two years from his date of termination with Sensus from taking employment with a Sensus competitor, or encouraging, soliciting, or attempting to induce any Sensus employee to terminate his/her employment with Sensus.  In addition, Franklin is barred from disclosing or using any of Sensus' confidential business information.

5.    On August 17, 2015, Franklin submitted notice of his resignation from Sensus, effective two weeks later.  On or about August 19, 2015, Sensus learned that Franklin accepted a position with Silver Springs Network.  Silver Springs Network is a direct competitor of Sensus.  Upon information and belief, Franklin will begin working for Sensus' direct competitor immediately after his last day of employment at Sensus.  Franklin's duties at Silver Springs Network will be substantially similar to the work he performed for Sensus.

6. "In assessing whether a temporary restraining order is warranted, the Court is generally guided by three factors: (i) the existence of a colorable claim, (ii) the irreparable harm that will be suffered if relief is not granted, and (iii) a balancing of hardships favoring the moving party." *CBOT Holdings, Inc. v. Chicago Bd. Options Exch., Inc.*, 2007 WL 2296356, *3 (Del. Ch.). "When deciding whether to issue a TRO, the Court's focus is less upon the merits of the plaintiff's legal claim than on the relative harm to the various parties if the remedy is or is not granted." *Trilogy Portfolio Co., LLC v. Brookfield Real Estate Fin. Partners, LLC*, 2012 WL 120201, *4 (Del. Ch.). "Indeed, if imminent irreparable harm exists, 'the remedy ought ordinarily to issue unless the claim is frivolous, granting the remedy would cause greater harm than denying it, or the plaintiff has contributed in some way to the emergency nature of the need for relief." *Id*. Sensus has asserted a colorable claim for breach of the Agreement, imminent irreparable harm exists, and the equities favor Sensus. Accordingly, the TRO Motion should be granted.

7. **Sensus Has Asserted A Colorable Claim**. "On an application for a TRO . . . the plaintiff need only state a colorable claim for relief, which is essentially a non-frivolous cause of action." *Reserves Dev. Corp. v. Wilmington Trust Co.*, 2008 WL 4951057, *2 (Del. Ch.). As detailed in the Complaint, the Agreement is a valid and enforceable contract. Franklin breached the material provisions of the Agreement by accepting a position with Sensus's direct competitor.

8. **Sensus Faces Imminent Irreparable Harm**. Franklin and Sensus agreed that specific performance, including injunctive relief is an appropriate remedy for violation of the Agreement. Section 7(e) of the Agreement states:

> All the parties hereto agree that their rights under this Section 7 are special and unique and that violation thereof would not be adequately compensated by money damages and each grants the other the right to specifically enforce (including injunctive relief where appropriate) the terms of this Agreement.

Injunctive relief is appropriate to remedy Franklin's clear violation of the Agreement and he should be immediately enjoined from working for Silver Springs Network for the pendency of the Post-Employment Restrictions. Moreover, absent injunctive relief, Franklin will continue to work for a direct competitor in a substantially similar area of work in violation of the Agreement and further risk the disclosure Sensus's Confidential Information in violation of Section 7(c) of the Agreement. Moreover, absent injunctive relief, Sensus will be deprived of the benefit of the bargain provided for in the Agreement.

9. **The Equities Favor An Injunction**. Absent a temporary restraining order Sensus risks imminent irreparable harm and will be deprived of the benefits of the Agreement. Franklin has demonstrated himself to be mobile in his employment and can go to work for any number of companies that are not a "Competitive Business" under the Agreement.

**CONCLUSION**

For the reasons stated herein, Sensus respectfully request that the Court grant the TRO Motion and enter an order in the form filed herewith.

PROCTOR HEYMAN ENERIO LLP

*/s/ Samuel T. Hirzel, II*
Samuel T. Hirzel (#4415)
Aaron M. Nelson (#5941)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
*Attorneys for Plaintiffs*

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
Kevin S. Joyner
N.C. Bar No. 25605
Phillip J. Strach
N.C. Bar No. 29456
J. Allen Thomas
N.C. Bar No. 40119
4208 Six Forks Road, Suite 1100
Raleigh, N.C. 27609
Telephone: (919) 787-9700
Facsimile: (919) 783-9412
Kevin.Joyner@ogletreedeakins.com
Phil.Strach@ogletreedeakins.com
Allen.Thomas@ogletreedeakins.com

August 24, 2015

# EXHIBIT
# 6

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| SENSUS USA, INC., SENSUS WORLDWIDE LIMITED, and SENSUS WORLDWIDE HOLDINGS LIMITED, | ) | |
| Plaintiffs, | ) | |
| v. | ) | C.A. No. |
| BENJAMIN P. FRANKLIN, JR., | ) | |
| Defendant. | ) | |

**[PROPOSED] ORDER GRANTING**
**MOTION FOR TEMPORARY RESTRAINING ORDER**

Having considered the Motion for Temporary Restraining Order (the "Order") filed by Plaintiffs Sensus USA, Inc., Sensus Worldwide Limited, and Sensus Worldwide Holdings Limited (collectively "Sensus"), and any opposition thereto,

IT IS HEREBY ORDERED as follows:

1. The Motion is GRANTED;

2. Plaintiff Benjamin P. Franklin, Jr. ("Franklin") is temporarily enjoined and shall not provide services, including but not limited to, product and sales management, business planning and operations, and any activity involving the manufacturer, sale, or distributionof metering systems and automatic metering infrastructure for water, gas, and electric utilities for Silver Spring Networks, Inc. as set forth in the Employment and Non-Interference Agreement between Franklin

and Sensus which is dated June 13, 2006 and is attached as Exhibit 1 to the Verified Complaint filed by Sensus in the above-captioned action; and

3. Unless otherwise ordered by the Court, the temporary injunctive relief provided by this order will remain in effect until the date upon which the Court issues a decisions resolving Sensus's forthcoming motion for preliminary injunction.

SO ORDERED this ________ day of __________________, 2015.

_________________________

# EXHIBIT 7

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| SENSUS USA, INC.; SENSUS WORLDWIDE LIMITED; AND SENSUS WORLDWIDE HOLDINGS LIMITED<br><br>Plaintiffs,<br><br>v.<br><br>BENJAMIN P. FRANKLIN, JR.,<br><br>Defendant. | ) | Civil Action No. ________________ |

**MOTION TO EXPEDITE PROCEEDINGS**

Plaintiffs Sensus USA, Inc., Sensus Worldwide Limited, and Sensus Worldwide Holdings Limited (collectively, "Sensus") bring this action against Defendant Benjamin P. Franklin, Jr. ("Franklin" or "Defendant") and respectfully seek expedited proceedings.

1. Franklin was an executive at Sensus starting in June 2006, when Sensus acquired substantially all the assets of Advanced Metering Data Systems, LLC, a company founded by Franklin. Franklin benefitted significantly from this acquisition. He was employed by Sensus in the position of Director of Business Development and Director of Sales.

2. On August 17, 2015, Franklin submitted his notice of resignation from Sensus, effective two weeks later. On or about August 19, 2015, Sensus learned that

Franklin accepted a position with Silver Springs Network. Silver Springs Network is a direct competitor of Sensus. Franklin will begin working for Sensus' direct competitor immediately after his last day of employment at Sensus. Franklin's duties at Silver Springs Network will be substantially similar to the work he performed for Sensus.

3. Sensus seeks injunctive relief – including a temporary restraining order and a preliminary injunction – against Defendant Benjamin P. Franklin, Jr. ("Defendant" or "Franklin"), a former employee of Sensus who has accepted an employment offer from one of Sensus' direct competitors in violation of his covenant not to compete (the "Non-Compete").

4. "'Delaware courts are always receptive to expediting any type of litigation in the interests of affording justice to the parties . . .' and [t]he Court of Chancery Rules give the court broad discretion to accelerate the pace of proceedings." *Id*. at *4 (quoting *Box* v. *Box,* 697 A.2d 395, 399 (Del. Super. Ct. 1997) and citing to several rules). The Delaware Court of Chancery "traditionally has acted with a certain solicitude for plaintiffs" and "has followed the practice of erring on the side of more [expedited] hearings rather than fewer." *Giammargo* v. *Snapple Beverage Corp.*, 1994 WL 672698, *2 (Del. Ch.). As a result, "[a] party's request to schedule an application for a preliminary injunction, and to expedite the discovery related thereto, is normally routinely granted. Exceptions to that norm are

rare." *In re Int'l Jensen, Inc. S'holders Litig.*, 1996 WL 422345, *1 (Del. Ch.). Indeed, this Court routinely expedites matters in which preliminary relief is sought so long as the plaintiff has a colorable claim and demonstrates the risk of imminent, irreparable harm. *See Sinchareonkul*, 2015 WL 292314, at *4. "'In assessing a motion to expedite, the Court need not-and, indeed, should not-make factual findings. It is, instead, guided by the well-pled, verified allegations of the Complaint.' At this procedural stage, the plaintiff receives the benefit of all reasonably conceivable inferences." *Sinchareonkul* v. *Fahnemann*, 2015 WL 292314, *1 (Del. Ch.) (quoting *Shocking Techs., Inc.* v. *Michael*, 2012 WL 165561, *1 (Del. Ch.)).

5. The first requirement for expedited treatment is the existence of a "colorable showing that the hearing is warranted." *Id*. "[T]he standard for expedition, colorability, which simply implies a non-frivolous set of issues, is even lower than the 'conceivability' standard applied on a motion to dismiss." *Id*. at *1, n. l (citing *In re BioClinica, Inc. S'holder Litig.*, 2013 WL 5631233, at *1 n.l (Del. Ch.)). As set forth in the Verified Complaint, and in the Motion for Temporary Restraining Order filed contemporaneously herewith, Sensus has a more than colorable claim that Franklin has breached or imminently will breach the Non-Compete by working for a direct competitor – Silver Springs Network.

6. The Court typically agrees to set an expedited preliminary injunction hearing where "the plaintiff has articulated a sufficiently colorable claim and shown a sufficient possibility of a threatened irreparable injury, as would justify imposing on the defendants and the public the extra (and sometimes substantial) costs of an expedited preliminary injunction proceeding." *Id*. at *4 (citing *Giammargo*, 1994 WL 672698, *2 (Del. Ch.)) (emphasis added). Sensus will be subjected to imminent, irreparable harm in the event Franklin aids Silver Springs Network in its competition with Sensus. (Verified Complaint ¶¶ 24, 25). Indeed, Franklin and Sensus agreed that specific performance, including injunctive relief is an appropriate remedy for violation of the Agreement. Non-Compete § 7(e) states:

> All the parties hereto agree that their rights under this <u>Section 7</u> are special and unique and that violation thereof would not be adequately compensated by money damages and each grants the other the right to specifically enforce (including injunctive relief where appropriate) the terms of this Agreement.

7. Sensus respectfully requests that the Court enter an order in the form submitted herewith, establishing a prompt hearing on Plaintiff's contemporaneously-filed Motion for a Temporary Restraining Order followed by a schedule for Sensus' forthcoming Motion for a Preliminary Injunction.

PROCTOR HEYMAN ENERIO LLP

*/s/ Samuel T. Hirzel, II*
Samuel T. Hirzel (#4415)
Aaron M. Nelson (#5941)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
*Attorneys for Plaintiffs*

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
Kevin S. Joyner
N.C. Bar No. 25605
Phillip J. Strach
N.C. Bar No. 29456
J. Allen Thomas
N.C. Bar No. 40119
4208 Six Forks Road, Suite 1100
Raleigh, N.C. 27609
Telephone: (919) 787-9700
Facsimile: (919) 783-9412
Kevin.Joyner@ogletreedeakins.com
Phil.Strach@ogletreedeakins.com
Allen.Thomas@ogletreedeakins.com

# EXHIBIT 8

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| SENSUS USA, INC., SENSUS WORLDWIDE LIMITED, and SENSUS WORLDWIDE HOLDINGS LIMITED, | ) | |
| Plaintiffs, | ) | |
| v. | ) | C.A. No. |
| BENJAMIN P. FRANKLIN, JR., | ) | |
| Defendant. | ) | |

**[PROPOSED] ORDER GRANTING**
**<u>MOTION TO EXPEDITE PROCEEDINGS</u>**

WHEREFORE, Plaintiffs having moved the Court for an Order expediting these proceedings (the "Motion"), the Court having considered the Motion and for good cause shown,

IT IS HEREBY ORDERED, this ___ day of ______________, 2015, that:

1. Plaintiffs' Motion is GRANTED.

2. The hearing to consider Plaintiffs' Motion for Temporary Restraining Order shall be conducted at ____________ _.m. on _________ __, 2015.

3. Defendants shall answer the Verified Complaint on or before __________, ______, 2015.

_____________________