IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SENSUS USA, INC., SENSUS WORLDWIDE LIMITED, and SENSUS WORLDWIDE HOLDINGS LIMITED, | : : : | |
| | : | |
| Plaintiffs, | : | C.A. No. 15-742-RGA |
| | : | |
| v. | : | |
| | : | |
| BENJAMIN P. FRANKLIN, JR., | : | |
| | .: | |
| Defendant. | : | |

## MEMORANDUM OPINION

Samuel T. Hirzel, Esq., and Aaron M. Nelson, Esq., Wilmington, Delaware; Kevin S. Joyner, Esq. (argued), Phillip J. Stratch, Esq., and J. Allen Thomas, Esq., Raleigh, North Carolina, Attorneys for the Plaintiffs.

Margaret M. DiBianca, Esq., and Pilar G. Kraman, Esq. (argued), Wilmington, Delaware, Attorneys for the Defendant.

April 14, 2016

ANDREWS, U.S. DISTRICT JUDGE:

Before the Court is the Plaintiffs' Motion for Preliminary Injunction (D.I 26), supporting

memorandum (D.I. 26), and reply brief (D.I. 31). Oral argument on the motion was held on

February 19, 2016. (D.I. 34). For the reasons discussed, Plaintiffs' motion is **GRANTED.**

## BACKGROUND

Plaintiff Sensus USA, Inc.[1] (Sensus) is a Delaware corporation headquartered in Raleigh,

North Carolina. (D.I. 3 at ¶ 3). Prior to June 2006, Sensus was primarily engaged in the

manufacture, sale and distribution of individual utility meters. (*Id.* at ¶ 5). In June 2006, Sensus

acquired Advanced Metering Data Systems, LLC (AMDS) though an asset purchase agreement

dated June 2, 2006. (*Id.* at ¶ 6). Sensus acquired AMDS for the specific purpose of obtaining the

fixed-network metering technology that AMDS had developed. (*Id.*). That technology formed

the basis for the current "FlexNet" technology that Sensus offers to customers. (*Id.*). The

acquisition fundamentally altered the nature of Sensus' business operations as Sensus is now

engaged in the development of fixed-network automated infrastructure solutions for public

utilities. (*Id.*).

As part of the AMDS acquisition, Sensus negotiated to retain select AMDS employees.

(*Id.* at ¶ 7). Defendant Franklin was one of four AMDS employees who received employment

offers from Sensus related to the asset purchase agreement. (*Id.*). Prior to beginning his

employment with Sensus, Franklin executed an Employment and Non-Interference Agreement

---

[1] Sensus USA, Inc. is a direct, wholly owned subsidiary of Sensus Worldwide Limited and an
indirect, wholly owned subsidiary of Sensus Worldwide Holdings Limited. Sensus Worldwide
Limited is a direct, wholly owned subsidiary of Sensus Worldwide Holdings Limited. Both
Sensus Worldwide Limited and Sensus Worldwide Holdings Limited are organized under the
law of Bermuda.

(the "Employment Agreement") which contained Non-Competition, Non-Solicitation, Non-Disclosure, and Non-Disparagement provisions. (D.I. 1, Ex. A at 19-21). In the event of a termination, these restrictions prevent Franklin from working for a competitor for two years, from soliciting Sensus' customers or employees for two years, and from disclosing Sensus' confidential business information. (*Id.*).

Under the Employment Agreement, Franklin was employed by Sensus as a Director of Business Development. (D.I. 9 at ¶ 8; D.I. 3 at ¶ 9). He held this role until 2010 when he moved to a Director of Sales position. (D.I. 9 at ¶ 9). While his base salary remained the same, his bonus compensation was governed by a different compensatory scheme. (*Id.*). Franklin was later promoted to Senior Director of Sales East. (D.I. 3 at ¶ 12; D.I. 9 at ¶ 11). Franklin oversaw sales for the Eastern United States and managed a team of six Directors of Sales. (D.I. 3 at ¶ 12). Sensus eventually restructured its sales team and Franklin became an individual contributor once again. (*Id.*). As an individual contributor, Franklin remained a part of the key accounts sales team responsible for some of Sensus' largest clients. (D.I. 4 at ¶ 8; D.I. 36 at ¶ 5).

Following the restructuring, the relationship between Sensus and Franklin began to deteriorate. (D.I. 9 at ¶ 13). Citing several factors, Franklin submitted his resignation to Sensus on August 17, 2015, effective two weeks later. (*Id.* at ¶¶ 13-14; D.I. 30 Ex. 2 at 4-5). He also informed Sensus that he would be taking a position with Silver Springs Network (SSN), a Sensus competitor. (D.I. 9 at ¶ 18). In response, Sensus sent Franklin a letter alerting him to his continuing obligations under the Employment Agreement. (D.I. 8, Ex. C at 2). Franklin began working with SSN on August 24, 2015. (D.I. 9 at ¶ 20). On that same day, Sensus instituted this

action to enjoin Franklin from working for SSN, or any other competitor, during the
Employment Agreement's restrictive period. (D.I. 1, Ex. A at 4-9).

## PROCEDURAL HISTORY

Sensus initially brought this action in the Delaware Court of Chancery. (D.I. 1 at ¶ 1).
Franklin later removed the action to this court on August 26, 2015. (D.I. 1).  SSN and Franklin
subsequently filed an action in the Superior Court of Fulton County, Georgia. (D.I. 6).  That
court stayed proceedings pending a final resolution of this action. (D.I. 12; D.I. 14).

This Court granted a Temporary Restraining Order (TRO) in favor of Plaintiff on
October 2, 2015. (D.I. 20).  Following that restraining order, SSN terminated Franklin's
employment. (D.I. 30 at ¶ 19).  SSN indicated to Franklin they would re-hire him if he were
legally allowed to work in the industry. (*Id.*).  Subsequently, Franklin sought employment which
would not violate the TRO. (*Id.* at ¶ 20).  He accepted a position with another company and is
currently employed in that role. (*Id.*).

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy that should be granted only if (1)
the plaintiff is likely to succeed on the merits; (2) denial will result in irreparable harm to the
plaintiff; (3) granting the injunction will not result in irreparable harm to the defendant; and (4)
granting the injunction is in the public interest." *NutraSweet Co. v. Vit-Mar Enterprises, Inc.*,
176 F.3d 151, 153 (3d Cir. 1999) (internal citation omitted).  Only if the movant produces
evidence sufficient that all four factors favor preliminary relief should the injunction issue. *See
Opticians Ass'n of Am. v. Indep. Opticians of Am.* 920 F.2d 187, 192 (3d Cir. 1990).

4

## ANALYSIS

1.   **Success on the Merits**

In evaluating whether or not a preliminary injunction should be granted, a court must first examine whether a movant is likely to succeed on the merits of the claim. Here, the question would be whether Sensus is likely to succeed in showing that Franklin breached the restrictive covenants of his employment agreement. In order to assess the probability of success on the merits, this Court must determine (a) the applicability of Delaware law to this dispute, (b) whether the restrictive covenants have lapsed, and (c) whether the restrictive covenants contained in the Employment Agreement are enforceable.

a.   Delaware Law Applies to this Dispute

The Employment Agreement executed between Sensus and Franklin provides that any litigation arising from the agreement shall be resolved in Delaware under Delaware law. (D.I. 1, Ex. A at 27-28). Franklin does not assert that the choice-of-law and venue provisions are invalid or unenforceable, but rather that they should not apply to this dispute. (D.I. 31 at 18-21). In determining whether such choice-of-law provisions will apply, Delaware Courts have consistently applied § 187 of the Restatement (Second) of Conflicts of Laws. *Coface Collections N. Am. Inc. v. Newton,* 430 F. App'x 162, 167 n.7 (3d Cir. 2011). Under §187(2), a choice-of-law clause will be enforced unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular

5

issue and which would be applicable law in the absence of an effective choice of law by the

parties. *Restatement (Second) of Conflict of Laws § 187(2) (1971)*.

> i)   Delaware has a substantial relationship to the parties

The Third Circuit has held that Delaware has a substantial relationship to a transaction

when it is the location where one of the transacting parties is incorporated. *Coface,* 430 F. App'x

at 167. "When parties choose to form a Delaware entity and utilize Delaware's system of laws

and dispute resolution, they are bargaining for a valuable array of reliable services relating to

their entity's internal affairs." *Id.* (internal citations omitted). Indeed, as the court went on to

note:

> The idea that a party's incorporation in the state of Delaware establishes a
> significant connection to the state is embodied in 6 Del. C. § 2708, which provides,
> in relevant part:
>
>> The parties to any contract, agreement or other undertaking,
>> contingent or otherwise, may agree in writing that the contract,
>> agreement or other undertaking shall be governed by or construed
>> under the laws of this State, without regard to principles of conflicts
>> of laws, or that the laws of this State shall govern, in whole or in
>> part, any or all of their rights, remedies, liabilities, powers and duties
>> if the parties, either as provided by law or in the manner specified in
>> such writing are, (i) subject to the jurisdiction of the courts of, or
>> arbitration in, Delaware and, (ii) may be served with legal process.
>> *The foregoing shall conclusively be presumed to be a significant,
>> material, and reasonable relationship with this State and shall be
>> enforced whether or not there are other relationships with this State.*

*Id.* (emphasis in original).

Like the plaintiff corporation in *Coface,* Sensus is incorporated in Delaware and

headquartered in another state. The company does business throughout the United States and

Canada. Because Sensus chose to incorporate in Delaware and because the contract itself

explicitly designates Delaware law to govern any dispute, Delaware has a substantial relationship

to this transaction. This is consistent with the Third Circuit's reasoning in *Coface*, as well as the underlying policy embodied in § 2708. The first exception to § 187(2) does not apply in this case.

        ii)    Georgia's interest is not materially greater than that of Delaware

The second exception contained in § 187(2) of the Restatement provides that Delaware law would not apply to this dispute if to do so would be contrary to the fundamental policy of a state with a materially greater interest than Delaware. Franklin asserts in his briefing that Georgia has a materially greater interest than that of Delaware in this dispute, and that restrictive covenants on employment are contrary to fundamental policy in Georgia. (D.I. 31 at 18-21). The question therefore becomes whether Georgia has a materially greater interest than Delaware in determining the effect of the restrictive covenants.

The Third Circuit held that Delaware has a substantial interest in enforcing voluntarily negotiated contract clauses that explicitly designate Delaware law. *Coface,* 430 F. App'x at 168. "[Delaware] citizens ought to be able to use our law as a common language for their commercial relationships, particularly when those relationships involve interstate commerce and do not center in any material manner on the geography of any particular party's operational headquarters." *Abry Partners V, L.P. v. F & W Acquisition LLC,* 891 A.2d 1032, 1049-50 (Del. Ch. 2006). Additionally, while geographical contacts with other states are considered, such contacts alone may be insufficient to demonstrate a materially greater interest. *See Coface,* 430 F. App'x at 168. (although the defendant resides in Louisiana, signed the contract there, and runs a competing business there, Louisiana did not have a materially greater interest than Delaware).

7

While Georgia may have a substantial interest in this dispute, such an interest is not materially greater than that of Delaware. The only ties that implicate Georgia are that Franklin lives there, works from his home there, and signed the contract there. However, Sensus is a national company headquartered in North Carolina and Franklin's sales territory extended beyond Georgia. (D.I. 3 at ¶¶ 3, 12). The parties voluntarily negotiated the contract clause expressly designating Delaware law to govern any disputes. Thus, Franklin's contacts with Georgia do not establish that Georgia possesses a materially greater interest than Delaware in this matter. Delaware has a fundamental interest in allowing its citizens to use its law as a commercial lingua franca to transact business across borders. *See Abry Partners,* 891 A.2d at 1049-50. Franklin has not shown that Georgia's interest is so great as to supersede that of Delaware.

Franklin has also noted that restraints on employment are generally viewed to be against Georgia public policy. However, since Georgia's interest in this dispute is not materially greater than that of Delaware, and since §187(2) does not apply, this Court need not address whether the application of Delaware law would be contrary to Georgia's public policy disfavoring restrictive covenants on employment.

Because the contract explicitly designates Delaware law and because the exceptions contained in §187(2) of the Restatement do not apply, this Court finds that Delaware law must be applied to this dispute.

      b.    The Employment Agreement's Restrictive Covenants Have Not Lapsed

The threshold question is whether "Term of Employment" as set forth in Section 1 of the Employment Agreement should be interpreted to mean Franklin's employment with Sensus

generally or, as Franklin asserts, only his employment as a Director of Business Development. That determination impacts when the restrictive covenants began to run and whether they have lapsed.

Franklin argues that his 2010 transition to Director of Sales effectively terminated the "Term of Employment" under the Employment Agreement. (D.I. 29 at 14). Section 9 of the Employment Agreement defines "Term of Employment" as "[having the] meaning set forth in Section 1." (D.I. 1, Ex. A. at 24). Franklin relies on one sentence in Section 1 specifically to support his argument: "During the Term of Employment, the Company agrees to retain the Executive in its employ, and the Executive agrees to remain in the employ of the Company, as Director of Business Development." (D.I. 1, Ex. A. at 15). From this sentence, Franklin concludes that the Employment Agreement's applicability is limited solely to the time spent as Director of Business Development and terminated as a result of his transition. As such, the restrictive covenants set forth in the Employment Agreement would have lapsed in 2012 and no longer bind Franklin's conduct.

Under Delaware law, the role of a court in interpreting a contract is to effectuate the parties' intent. *ATT&T Corp. v. Lillis,* 953 A.2d 241, 252 (Del. 2008). The Court must first review the language of the contract to determine if the intent of the parties can be ascertained from the express words chosen by the parties. *Del. Exp. Shuttle, Inc. v. Older,* 2002 WL 31458243, at *6 (Del. Ch. Oct. 23, 2002). The Court will ascribe words their common and ordinary meaning. *Sassano v. CIBC World Markets Corp.,* 948 A.2d 453, 462 (Del. Ch. 2008). When the plain, common, and ordinary meaning of the word lends itself to only one reasonable interpretation, that interpretation controls the litigation. *Id.*

9

The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the parties' position would have thought it meant. *Id.* Additionally, a court must construe the agreement as a whole, giving effect to all provisions therein. *GMG Capital Invs., LLC v. Athenian Venture Partners,* 36 A.3d 776, 780 (Del. 2012). The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan. *Id.*

Neither party asserts that the terms of the contract are ambiguous. Rather, Franklin argues that the plan language of Section 1 defines of "Term of Employment" to mean only the time during which he is employed as Director of Business Development. (D.I. 29 at 15). This Court has previously examined the plain and ordinary meaning of the word "term" and noted that "'[t]erm' is defined as: 'a limited period of time during which something lasts.'" *Haft v. Dart Grp. Corp.,* 1994 WL 828326, at *9 (D. Del. Aug. 17, 1994). The plain and ordinary meaning of "Term of Employment" would therefore refer to the period of time during which Franklin is employed by Sensus. The usage of "Term of Employment" contained in the Employment Agreement reinforces this plain reading. The first sentence of Section 1 reads:

> Subject to Section 25, the "Term of Employment" shall commence as of the Closing Date (as defined in the AMDS [Asset Purchase Agreement]), and extend to the date that is three (3) years after the Closing Date (the "Third Anniversary"), unless sooner terminated as hereinafter provided; provided, that such term shall continue for the twelve-month period following the Third Anniversary, and for each twelve-month period thereafter, unless at least 90 days prior to the scheduled expiration date, either the Executive or the Company notifies the other of its decision not to continue such term.

(D.I. 1, Ex. A. at 15)(underlining deleted).

The express words chosen by the parties and the plain and ordinary meaning of "Term of Employment" support only one reasonable inference which is consistent with the overall purpose of the contract. Pursuant to Section 1, which is captioned, "Nature of Employment; Term of Employment," "Term of Employment" is defined as a three-year period of time subject to one-year extensions and may be terminated as provided. As defined, "Term of Employment" is not impacted by the position Franklin holds during that time. The sentence that Franklin cites in support of his argument is about the "nature of employment," not about the "Term of Employment." The language employed in that sentence is insufficient to suggest that the parties intended for it to modify the definition of "Term of Employment" to mean only the period of time during which Franklin is employed as a Director of Business Development. Notably absent from that sentence is any obligatory language requiring that Franklin remain as the Director of Business Development. While obligatory words like "shall" and "will," which require certain conduct by the parties and illustrate their intent, are employed in every other sentence contained in Section 1, no such words are used in that sentence. Based on the express words chosen by the parties, the reasonable inference is that the parties did not intend for this sentence to modify the definition, but rather to merely articulate their mutual understanding as to the position Franklin would assume upon the commencement of his employment with Sensus.

Other sections of the Employment Agreement support this inference. Section 4 of the Employment Agreement provides extensive detail as to the situations under which termination may occur. (D.I. 1, Ex. A at 16-18). Indeed, the Employment Agreement contemplated that Franklin might take a different position within the company, and with different responsibilities. He would then have the option of terminating his employment. "The Term of Employment may

11

be terminated at any time by the Executive … under circumstances involving a material

reduction in the Executive's position, authority, base compensation or benefits…" (D.I. 1, Ex. A

at 17). When Franklin was moved from position to position in 2010 and 2012, with changes in

authority or benefits, he could terminate the "Term of Employment" if there was a "material"

downgrade in his work situation. He had to make that choice. He did not make it until 2015.

Thus, the employment agreement continued until then.

     More generally, the termination events set forth in Section 4 share one commonality:

each results in the end of Franklin's employment relationship with Sensus. None of the

termination events set forth in Section 4 contemplate a situation where Franklin remains

employed with Sensus but is not subject to the terms of the contract. Construing the contract as a

whole, it would be unreasonable to interpret "Term of Employment" as position-specific absent

some express declaration to that effect.

     Discussing each possible termination scenario provided in Section 4 demonstrates that

Franklin's 2010 transition would not be considered a termination under the Employment

Agreement. Franklin's promotion to Director of Sales does not constitute a Company

Termination under Section 4(a) because: Franklin did not die; he was not unable to perform his

duties due to physical or mental disability; he was not terminated for Cause or Material Breach

as defined in the agreement; and his employment with Sensus was not terminated for any other

reason. (D.I. 1, Ex. A at 16-17)[2].

     Second, Franklin's 2010 transition does not constitute "Executive Termination" under

Section 4(b) for the same reasons: he did not die; suffer from physical or mental disability; there

---

[2] Franklin concentrates on the analysis for the 2010 job change. The later job change would
follow the same analysis.

is nothing on the record to suggest that he accepted the position of Director of Sales due to an adverse or hostile work environment; and there is also no evidence that Franklin complied with any of the notice requirements mandated to effectuate termination under 4(b)(iv).  (*Id.* at 17).

Third, Franklin's promotion does not constitute a mutual termination because Section 4(c) provides that "[a]ny termination of the Executive's employment by mutual agreement of the parties will be memorialized by an agreement which is reduced in writing and signed by the Executive and a duly appointed officer of the company." (D.I. 1, Ex. A at 18).  Franklin's employment with Sensus was not terminated in 2010 and there is no written agreement between the parties contained in the record which purports to demonstrate mutual termination under section 4(c).  For these reasons, Franklin's 2010 move to Director of Sales did not terminate the Term of Employment under Section 4.

Finally, inferring "Term of Employment" to apply only to Franklin's role as Director of Business Development is unreasonable as it would conflict with the overall scheme of the Employment Agreement.  At its core, the agreement seeks to govern the relationship between Franklin and Sensus both during and following Franklin's employment with the company.  The very purpose of the relevant restrictive covenants is to define the parties' obligations to one another *after* the employment relationship ends.  Those objectives form a large part of the overall purpose of the Employment Agreement and interpreting this contract in the manner Franklin suggests would ultimately frustrate that purpose.

Because there was no termination of the "Term of Employment" under the Employment Agreement and because the parties intended for the restrictive covenants contained in the Employment agreement to apply following the termination of the employment relationship, this

13

Court finds that the restrictive covenants contained in the Employment Agreement began to run in August 2015 following Franklin's departure from Sensus. The relevant covenants have not yet lapsed and are still in force.

      c.      The Restrictive Covenants are Enforceable

Delaware law recognizes restrictive covenants on employment when such covenants: (i) adhere to general principles of contract, (ii) are reasonable in scope and duration, (iii) advance the legitimate economic interests of the party enforcing the covenant, and (iv) "survive a balance of the equities." *TriState Courier and Carriage, Inc. v. Berryman,* 2004 WL 835886, at *10 (Del. Ch. April 15, 2004). The court will examine the specific factual circumstances to determine enforceability. *McCann Surveyors, Inc. v. Evans,* 611 A.2d 1, 3 (Del. Ch. 1987). There is little doubt that the Employment Agreement adheres to general contract principles of mutual assent and consideration. Franklin received a job and bonus compensation for signing the agreement. (D.I. 3 at ¶¶ 7-8).

      i)      The restrictive covenants are reasonable in scope and duration

Delaware courts have consistently found that two-year restrictions on covenants not to compete are reasonable, especially in industries where business transactions take years to conclude. *See Weichert Co. of Pa. v. Young,* 2007 WL 4372823, at *4 (Del. Ch. Dec. 7, 2007); *Delaware Exp. Shuttle, Inc. v. Older,* 2002 WL 31458243, at *14 (Del. Ch. Oct. 23, 2002) (reducing three-year restriction to two years due to customer turnover rate); *COPI of Delaware, Inc. v. Kelly*, 1996 WL 633302, at *4 (Del. Ch. Oct. 25, 1996) (finding a two-year restriction reasonable for sales personnel with customer contact). Here, the contracts that Sensus and other companies in the industry negotiate with clients often take years to cultivate and implement.

(D.I. 4 at ¶ 7). Clients often maintain the ability to cancel and hire competing companies during the implementation phase of these contracts. (*Id.*). As a result, two years is a reasonable amount of time to allow Sensus to further develop client relationships free from the competitive influence of former employees.

Delaware has also upheld the reasonableness of geographic restrictions such as this one. *See Tristate,* 2004 WL 835886, at *11; *Delaware Exp. Shuttle, Inc.,* 2002 WL 31458243, at *14. Franklin is prohibited from competing with Sensus in "any county, province or similar local jurisdiction" where Sensus or AMDS conducted business "prior to the date [of the Employment Agreement] or engaged in at any time during the Term of Employment." (D.I. 1, Ex. A at 15). Simply put, Franklin is only enjoined from competing in those locations where Sensus or AMDS have conducted business prior to his termination. Restrictive covenants which bar a former employee from competing in an area where the employer has conducted business have been found to be reasonable because they protect the legitimate economic interests of the employer and provide a reasonable and foreseeable basis for ascertaining the territorial scope of the covenant. *Tristate,* 2004 WL 835886, at *11 (internal quotation omitted); *Research & Trading Corp. v. Pfuhl,* 1992 WL 345465, at *12 (Del. Ch. Nov. 18, 1992) (Upholding a similar restrictive covenant based on the employer's market and not specific physical distances). There is no blanket restriction here, but rather a limited and specific restriction governing where Franklin can and cannot work for a competitor. Nothing prevents Franklin from accepting a position in a market where Sensus has not conducted business, or where Sensus began conducting business after August 17, 2015.

15

ii)     The restrictive covenants serve Sensus' legitimate business interests

Delaware courts have carved out a narrow list of legitimate business interests which companies may protect through the use of restrictive covenants. *TriState*, 2004 WL 835886, at *10. Such legitimate interests include preserving employer goodwill and protecting an employer's confidential information, including customer lists, pricing, trade secrets and proprietary information. *See Elite Cleaning Co., Inc. v. Capel*, 2006 WL 1565161, at *7-8 (Del. Ch. June, 2 2006); *Weichert*, 2007 WL 4372823, at *4 (companies have an interest in the goodwill created by their sales representatives); *Delaware Exp. Shuttle, Inc.*, 2002 WL 31458243, at *14 (finding that restrictive covenants on "key employees" with proprietary information serve legitimate business interests, even where such information holds little independent value).   The non-compete provisions contained in the Employment Agreement advance Sensus' legitimate business interests in this case.   It is undisputed that Franklin was a key employee at AMDS and had in-depth information regarding the proprietary technology that Sensus acquired when it purchased AMDS. Additionally, Franklin's positions at Sensus each involved cultivating client relationships, both as a Director of Business Development and as a Director of Sales.   The record indicates that while his duties became more focused following his 2010 transition, there was significant overlap between the tasks he performed for Sensus as a Director of Business Development and then as a Senior Director of Sales. (D.I. 30 at ¶¶ 8, 15; D.I. 35 at ¶7). Franklin states that, while acting as a Director of Business Development, he worked on all large deals, travelled with sales personnel, and personally led sales presentations because he possessed a level of knowledge with the technology not many other sales staff possessed. (D.I. 30 at ¶8.).   He had knowledge regarding

16

how Sensus prices and negotiates contracts, Sensus' business strategy, and he has worked on some of Sensus' largest accounts. (*Id.;* D.I. 4 at ¶ 7). Considering his critical position with Sensus, enjoining Franklin from working with a competitor would advance and protect Sensus' legitimate business interests.

iii)    A balance of the equities weighs in favor of enforcement

Balancing the equities may weigh against enforcement "where the interests the employer seeks to protect are ephemeral in contrast to the grave harm to the employee resulting from [enforcement]." *Weichert,* 2007 WL 4372823, at \*5. Here, Franklin is free to accept employment in a non-competitive industry or in a location which does not violate the agreement. He is an experienced business professional who has not had issues finding employment. Sensus, on the other hand, may suffer greatly absent enforcement of these provisions. Franklin has already indicated his intent to work for Sensus' competitors and his knowledge of Sensus business practices make him uniquely positioned to cause hardship to the company. It should also be noted that Sensus conditioned Franklin's employment on his acceptance of the restrictive covenants. *See Id.* ("Failing to enforce the covenants would deprive [the company] of the benefits of its bargain.") For these reasons, the balance of the equities weighs in favor of enforcement.

**2.    Irreparable Harm to the Plaintiff**

Section 17 of the Employment Agreement expressly provides that irreparable harm to Sensus will result from the any breach of Sections 7 or 8. The section also articulates the parties' mutual agreement regarding irreparable harm resulting from breach. (D.I.1, Ex. A at 26). For reasons already set forth, Sensus has successfully demonstrated that it will suffer irreparable harm if Franklin is not enjoined. Franklin's employment history with Sensus supports a finding of

17

irreparable harm. The record indicates that Franklin has in-depth knowledge regarding several key elements of Sensus' business operations. As a former executive of AMDS, Franklin is intimately familiar with Sensus' proprietary FlexNet system. The Parties recognize that Franklin worked on some of Sensus' biggest projects, a role which continued when he managed some large account clients as a Director of Sales. Sensus and Franklin both acknowledge Franklin's familiarity with Sensus' internal policies regarding pricing and contract negotiation.

Sensus also noted that it is actively competing directly with SSN for some contracts. (D.I. 4 at ¶ 14). While SSN terminated Franklin following the granting of the TRO, SSN did express that Franklin could resume work with SSN when he was legally permitted to work in the industry. Due to Franklin's history with Sensus, as well as his former and prospective relationships with SSN, it is likely that Sensus will suffer irreparable harm if Franklin is not enjoined.

3.    **Irreparable Harm to the Defendant**

Conversely, it is unlikely that Franklin will suffer irreparable harm should this injunction issue. Franklin is free to obtain employment which does not violate the covenants contained in the agreement. In fact, Franklin has already demonstrated his ability to find comparable employment with relative ease. Following his October 2015 termination from SSN, Franklin sought employment consistent with the TRO and began work with a third employer by December 2015. As such, Franklin does not demonstrate that irreparable harm would result from this injunction. He is free to further his sales career and earn a living consistent with the enforcement of the restrictive covenants.

4.      **The Public Interest**

It is in the best interest of the public to issue the injunction in this instance.  Parties who

freely enter into binding agreements should expect to comply with the terms of those

agreements. *See AMG Nat'l Trust Bank v. Ries,* 2007 WL 2713218, at *11 (E.D.Pa. Dec. 29,

2011).  This agreement was entered into by two competent, business-savvy parties and was

supported by consideration. Section 17 of the agreement also provides that, due to the sensitivity

of the non-public information, Sensus would be irreparably harmed by a violation of the

restrictive covenants and injunctive relief may be sought as a result. (D.I. 1, Ex. A at 26).  It is in

the interest of the public to hold parties to the very terms upon which they negotiated and agreed

to be bound.

5.      **Bonding Required under Federal Rule of Civil Procedure 65**

"The court may issue a preliminary injunction…only if the movant gives security in an

amount the court considers proper to pay the costs and damages sustained by any party found to

have been wrongfully enjoined or restrained." Fed.R.Civ.P 65(c).  While there are very limited

exceptions, where an injunction prevents commercial, money-making activities, as it does here,

such a bond is required and will not be excused. *See Zambetti Fireworks Mfg. Co., Inc. v. Wood,*

592 F.3d 412, 426 (3d Cir. 2010).  However, the court is free to exercise its discretion over the

amount it deems proper under the rule.  *Id.* It seems to me that a reasonable amount is

$250,000.00.  Sensus is hereby required to provide a security bond in the amount of

$250,000.00.

**CONCLUSION**

For the reasons discussed above, Plaintiffs' Motion for Preliminary Injunction (D.I. 26) is granted.

The parties should meet and confer, and Plaintiffs should submit a jointly agreed form of order within five business days.  Plaintiff should provide the security bond before the form of order is submitted.